UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 07-50127 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | DEFENDANT'S MOTION TO |
| JASON JOHNSON, | ) | SUPPRESS [DOCKET 28] |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court pursuant to an indictment charging

Defendant Jason Johnson with one count of being a felon in possession of a

firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), one count of

possession of a firearm by a person with a misdemeanor conviction, in violation

of 18 U.S.C. §§ 922(g)(2) and 924(a)(2), and one count of possession of a stolen

firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2).  [Docket 1].

Mr. Johnson moves the court to suppress statements made to state law

enforcement officers on August 15, 2007, during a traffic stop, on the grounds

that law enforcement elicited Mr. Johnson's statements in violation of the

protections afforded by Miranda v. Arizona, 384 U.S. 436 (1966).  [Docket 29].

Mr. Johnson argues that law enforcement's failure to advise him of his Miranda

warnings renders inadmissible both his pre-arrest and post-arrest statements

made in response to custodial interrogation and without the presence of counsel.  Id.  Mr. Johnson also moves to suppress the firearms seized from his vehicle after his arrest at the scene of the traffic stop on the grounds that the search of his vehicle and seizure of its contents violated the Fourth Amendment to the United States Constitution.  Id.

The government resists Mr. Johnson's motion, arguing that (1) the circumstances of his initial pre-arrest detention did not warrant the giving of Miranda warnings; (2) law enforcement did not conduct any post-arrest interrogation or questioning so as to necessitate the giving of Miranda warning; and (3) the search of their vehicle without a search warrant was proper as a search incident to arrest.  [Docket 35].  Mr. Johnson's motion to suppress was referred to this magistrate judge for a report and recommendation to the district court pursuant to Chief Judge Karen E. Schreier's standing order dated June 11, 2007, and 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing on Mr. Johnson's suppression motion was held on Monday, July 7, 2008.  Mr. Johnson and his attorney, Assistant Federal Public Defender George Grassby, were present as was the attorney for the government, Special Assistant United States Attorney Scott Roetzel.  Two witnesses testified in person at the hearing:  Pennington County Deputy Sheriff Bernard George and Pennington County Deputy Sheriff Jonathan Kirk.  From

2

the testimony and exhibits admitted at the hearing, the court finds the following facts.

On August 15, 2007, at approximately 1:00 a.m., Deputy George was on patrol, heading south on Jolly Lane toward the intersection of Jolly Lane and East South Dakota Highway 44, just outside the city limits of Rapid City, South Dakota. A vehicle driven by Jason Johnson pulled onto Jolly Lane in front of Deputy George from a side street adjoining Jolly Lane. The intersection of Jolly Lane and Highway 44 was controlled by a stop light which, at this time of night, was flashing red for motorists on Jolly Lane.

Shortly before the intersection of Jolly Lane and Highway 44, Jolly Lane crests and then descends to the intersection. Deputy George observed Mr. Johnson's vehicle slow down at the flashing red light, but ultimately roll through the intersection without stopping. Upon observing this, Deputy George caught up with Mr. Johnson's vehicle, turned on his emergency lights, and effected a traffic stop. Deputy George's patrol vehicle is equipped with a video recorder which switches on when the emergency lights are activated. Exhibit one, admitted at the hearing, is a video of this traffic stop.

Upon approaching the vehicle, Deputy George observed two firearms in plain sight on the rear passenger seat of Mr. Johnson's vehicle. Upon making contact with Mr. Johnson and his passenger, Deputy George smelled an odor of alcohol coming from the vehicle. Deputy George introduced himself and said

"the reason I pulled you over was you didn't come to a complete stop on . . ."
At which point Mr. Johnson completed Deputy George's sentence by stating
"Jolly Lane."  Deputy George asked Mr. Johnson for his driver's license, vehicle
registration and proof of insurance.  Mr. Johnson did not produce a driver's
license, indicating that it was at his house.

Deputy George asked about the rifle sitting on the back seat.
Mr. Johnson indicated it was a hunting rifle.

Deputy George asked Mr. Johnson to take a seat in the front of his patrol
vehicle, where he was joined by the deputy.  In response to questions from
Deputy George, Mr. Johnson identified himself to Deputy George as "Dave"
Johnson and gave a date of birth, but claimed he did not know his social
security number.  Deputy George asked Mr. Johnson how much he had had to
drink that night, to which Mr. Johnson replied, "I had about a beer and a half."
Deputy George then told Mr. Johnson he was going to check to make sure his
driver's license was valid and then perform some field sobriety tests to make
sure Mr. Johnson was safe to resume driving.

Deputy George called in the information about "Dave" Johnson and his
passenger to dispatch for a records check.  He then asked a number of
questions of Mr. Johnson related to sobriety (how much he had had to drink,
when he started drinking, when he finished his last drink, whether he had
received any injuries or was in need of medical attention, etc.).  Deputy George

4

then performed the horizontal gaze nystagmus test, asked Mr. Johnson to recite the alphabet, to count backwards from 49 to 34, to perform a heel-to-toe walking test, and to perform a one-legged stand.  He also had Mr. Johnson blow into a portable breath testing device.

At the conclusion of the field sobriety tests, Deputy George placed Mr. Johnson under arrest for the state charge of driving while under the influence and placed Mr. Johnson in handcuffs.  Deputy George then conducted a search of Mr. Johnson's person and discovered a South Dakota photo identification card identifying Mr. Johnson as "Jason" Johnson.  In his report, Deputy George wrote that the picture on the identification card "was an identical match to Dave."  See Docket No. 29, Exhibit 1.  Deputy George then asked Mr. Johnson if he was really "Jason" Johnson, to which Mr. Johnson assented.  Id.  Deputy George then asked Mr. Johnson why he lied to him, to which Mr. Johnson replied that he was "trying to get a break."  Id.  Although Mr. Johnson had been formally arrested at this point, neither Deputy George nor any other officer assisting Deputy George at the scene advised Mr. Johnson of his Miranda rights before Deputy George asked Mr. Johnson these questions.

Although on direct examination, Deputy George testified that he "never at any time" subjected Mr. Johnson to interrogation, he readily agreed on cross-examination that his question to Mr. Johnson, "why did you lie to me?" was, in

fact, interrogation.  The government orally conceded at the hearing that this statement should be suppressed.

Following Mr. Johnson's arrest, Deputy Jonathan Kirks, another Pennington County Deputy Sheriff who had responded to the scene to assist Deputy George, began escorting Mr. Johnson to Deputy George's patrol vehicle to place him in the back.  Mr. Johnson broke away from Deputy Kirk and shouted to his passenger, asking him to "help me out, home boy, help me out." Eventually, Deputy Kirk and another deputy sheriff regained control of Mr. Johnson, placed him in an "I bar," and succeeded in placing him in the back of Deputy George's vehicle.  Upon his re-entry into Deputy George's patrol vehicle, either Deputy George or another officer asked Mr. Johnson, "how can I trust you?"  No audible response can be heard on the tape.

Mr. Johnson was then left in the patrol vehicle while the officers at the scene searched his vehicle.  On the video recording, Mr. Johnson is heard to make numerous comments while the search is being conducted, but no officer was in the vehicle with him and the comments were made without any interrogation.  Deputy George re-entered the patrol vehicle at one point and asked Mr. Johnson whether he was still living at a particular address on Jolly Lane.  Mr. Johnson indicated that he was.

Deputy Kirk testified that he never asked Mr. Johnson any questions. Deputy Kirk assisted in the search of Mr. Johnson's vehicle.  He testified that

6

no officer, to his knowledge, sought Mr. Johnson's consent before embarking on that search.

When Deputy George was transporting Mr. Johnson to the jail, he said to Mr. Johnson, "tell you what, Jason, you kinda lost a-a-a-l-l-l your rights when you ran from me . . ."  The deputy then read Mr. Johnson an advice form notifying him that he was required under South Dakota law to submit to a blood draw in order to test for blood alcohol content.  Never at any time did Deputy George or any other officer at the scene advise Mr. Johnson of his Miranda rights.  Deputy George testified that he did not learn that Mr. Johnson had previously been convicted of either a felony or a misdemeanor until after Mr. Johnson's transportation to the jail was complete.

**DISCUSSION**

**A.    The Law Concerning Miranda Warnings at a Traffic Stop**

The holding in Miranda "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda, 384 U.S. at 444).  Miranda warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may chose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  A Miranda warning is required prior to

questioning whenever two conditions are present:  (1) the suspect is being interrogated <u>and</u> (2) the suspect is in custody.  <u>Unites States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  <u>See, e.g.,</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that defendants' statements were *not* the subject of custodial interrogation on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  <u>Griffin</u>, 922 F.2d at 1347 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984)).  Absent formal arrest,

8

a suspect is deemed to be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." <u>Berkemer</u>, 468 U.S. at 442; <u>United States v. Black Bear</u>, 422 F.3d 658, 661 (8th Cir. 2005); <u>Griffin</u>, 922 F.2d at 1347; <u>Carter</u>, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  <u>Berkemer</u>, 468 U.S. at 442; <u>Black Bear</u>, 422 F.3d at 661; <u>Griffin</u>, 922 F.2d at 1347; <u>Carter</u>, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  <u>Carter</u>, 884 F.2d at 370 (citing <u>United States v. Lanier</u>, 838 F.2d 281, 285 (8th Cir. 1988) (<i>per curiam</i>)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  <u>See</u> <u>Flores-Sandoval</u>, 474 F.3d at 1146-1147 (citing <u>Griffin</u>, 922 F.2d at 1349).  Reference to these factors is

9

helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

The Supreme Court in Berkemer addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of Miranda.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that Miranda warnings are required.  Berkemer, 468 U.S. at 434-435.

However, during the traffic stop itself and prior to arrest, the Court held that Miranda did not apply.  Id. at 440-441.  The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. Id. at 436.  However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in Miranda.  Id. at 436-438.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  Id. at 437.  Also, the

10

interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438. Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

### 1.    Pre-Arrest Statements

Mr. Johnson argues that any statements made to Deputy George during this initial, pre-arrest period must be suppressed because Deputy George did not provide Miranda warnings. In his brief, Mr. Johnson does not acknowledge the Berkemer case at all, but argues that Deputy George smelled the strong odor of alcohol as soon as he made contact with Mr. Johnson and that the officer determined at that point that Mr. Johnson would be arrested, at a minimum, for driving while under the influence of alcohol. Therefore, Mr. Johnson argues that his initial pre-arrest detention was the equivalent of a formal arrest and Deputy George should have administered Miranda warnings to him prior to questioning. The failure to do so, argues Mr. Johnson, requires the suppression of his pre-arrest statements.

However, as is evident from the above-discussed case law, whether a person is in custody is determined from the vantage point of the suspect, not from the point of view of the officer.   Berkemer, 468 U.S. at 442; Black Bear,

11

422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  Here, there is no evidence that Deputy George formed the subjective intent to arrest Mr. Johnson immediately upon making contact with him, as Mr. Johnson contends.  Even if this were the case, however, the subjective intent of the officer is irrelevant to the determination of whether *the suspect* felt he was in custody unless the officer communicated his subjective intent to the suspect. See Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145-146 (7th Cir. 1979) (holding that an officer's subjective intentions have little bearing on whether the suspect has a reasonable belief that he is not free to leave except to the extent the officer has communicated his belief to the suspect)).  If the officer formed the intent to arrest Mr. Johnson immediately upon making contact with him, that intent was never communicated to Mr. Johnson.

Instead, the evidence shows that until the officer completed the field sobriety tests with Mr. Johnson, the facts place this situation squarely within the routine traffic stop envisioned by Berkemer.  Nothing about the facts up to that point would have given Mr. Johnson reason to feel that this situation had advanced beyond a routine traffic stop and had become custodial such that Miranda warnings would have been required.  Berkemer, 468 U.S. at 440. Thus, the court recommends that pre-arrest statements made by Mr. Johnson not be suppressed because Mr. Johnson was not in custody at this point.

12

### 2.    Post-Arrest Statements

Mr. Johnson also argues that his statements made in response to Deputy George's questions after his formal arrest should be suppressed because Deputy George did not advise him of his <u>Miranda</u> rights.  The government does not dispute that Mr. Johnson was not given <u>Miranda</u> warnings.  However, with the exception of the concession regarding the question, "why did you lie to me?", the government contends that the officers did not interrogate or question Mr. Johnson after his arrest and, thus, suppression is not warranted.

As stated previously, a <u>Miranda</u> warning is required prior to questioning whenever two conditions are present: (1) the suspect is being interrogated <u>and</u> (2) the suspect is in custody.  <u>Flores-Sandoval</u>, 474 F.3d at 1146; <u>Griffin</u>, 922 F.2d at 1347; <u>Carter</u>, 884 F.2d at 371.  It is clear that Mr. Johnson was in custody for purposes of <u>Miranda</u> when he was handcuffed and placed under formal arrest.  Therefore, whether his statements should be suppressed depends on whether the statements were the product of police interrogation.

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980); <u>see also</u> <u>United States v. Head</u>, 407 F.3d 925, 925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect.").  The "words or actions" of the police must be outside the scope of words and actions

13

that normally accompany the arrest and taking into custody of a defendant. United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301).

At the outset, it is clear that, absent Miranda warnings, Deputy George's question, "Why did you lie to me?", constitutes interrogation as any response could incriminate Mr. Johnson and possibly lead to additional charges.[1]  See Head, 407 F.3d at 925.  The government was correct to concede that this statement should be suppressed.  By the same token, though, Deputy George's question asking if "Jason" was Mr. Johnson's correct name, after Mr. Johnson had lied about his identity and after Deputy George held in his hand the proof of that lie, constitutes interrogation as Mr. Johnson's response again could likely incriminate him.  See Pennsylvania v. Muniz, 496 U.S. 582, 600-601 (1990).

In Muniz, the defendant, who had been arrested for driving under the influence following a traffic stop and had not been advised of his Miranda rights, was asked a series of questions regarding his name, address, height, weight, eye color, date of birth, and current age during the booking process at the police station.  Id. at 585-86.  The defendant was also asked whether he knew what the date was of his sixth birthday.  Id. at 586.  With regard to the first series of questions, the Court held that, although it disagreed with the

_____

[1]The court notes that Mr. Johnson was charged in state court with false impersonation in addition to a host of other charges.

14

government's contention that the questions do not qualify as custodial interrogation, nevertheless such questions fell within a "routine booking question" exception to <u>Miranda</u>.  <u>Id</u>. at 601.  Answers provided in response to routine booking questions designed to secure biographical data necessary to complete the booking process fall outside of the scope of protections afforded by <u>Miranda</u>, and, thus, even in the absence of <u>Miranda</u> warnings, do not require suppression.  <u>Id</u>. at 601-02.  However, with regard to the question about the defendant's sixth birthday, the Court held that the defendant's response to custodial interrogation should have been suppressed because it was testimonial.  <u>Id.</u> at 600.

The Court defined testimonial evidence as all responses to questions that "could place the suspect in the 'cruel trilemma' " of self-accusation, perjury, or contempt.  <u>Id.</u> at 596-97.  The Court reasoned that, in response to the question about his sixth birthday, the defendant was confronted with the options of remaining silent (which the Court found would be difficult to do given the "inherently coercive environment created by the custodial interrogation"), incriminating himself because he did not know the answer, or answering untruthfully by providing an incorrect guess.  <u>Id.</u> at 598-99.  Hence, "the incriminating inference of impaired mental faculties stemmed, not just from the fact that [the defendant] slurred his response, but also from a testimonial aspect of that response."  <u>Id.</u> at 599.

In an Eighth Circuit case decided before <u>Muniz</u>, the court refused to suppress questions posed to a defendant by a pre-trial probation officer in the context of a bond interview pursuant to the Bail Reform Act.  <u>See</u> <u>United States v. McLaughlin</u>, 777 F.2d 388, 392 (8th Cir. 1985).  In this context, the court held that suppression was not required because the probation officer could not have expected the inquiry regarding the defendant's employment and residence to elicit an incriminating response.  <u>Id.</u>

In <u>United States v. Brown</u>, 101 F.3d 1272, 1274 (8th Cir. 1996), officers stopped the defendant's vehicle and arrested him for possession of cocaine after observing him engage in a drug transaction.  In response to the officers' question and without being provided <u>Miranda</u> warnings, the defendant provided a false name, and it was not until the next day that the officers learned of his true identity.  <u>Id.</u>  The defendant sought to suppress his statement giving a false name, arguing that he was subject to "custodial interrogation for investigative purposes," and should have been read his <u>Miranda</u> rights.  <u>Id.</u>  The Eighth Circuit affirmed the district court's refusal to suppress on the grounds that the question posed was not investigative in nature, the defendant's name was not related to the substantive offense charged, and the question  was "wholly incidental" and necessary for the booking process.  <u>Id.</u> at 1274-75.  The court reasoned that if the defendant had

provided his real name, the information would not have been incriminating.  Id.

at 1274.  The court provided the following analysis:

> It is well-settled that routine biographical data is exempted from
> Miranda's coverage.  We have said:
>
>> A request for routine information necessary for basic
>> identification purposes is not interrogation under Miranda,
>> even if the information turns out to be incriminating.  Only
>> if the government agent should reasonably be aware that
>> the information sought, while merely for basic identification
>> purposes in the usual case, is directly relevant to the
>> substantive offense charged, will the question be subject to
>> scrutiny.

Id. (quoting McLaughlin, 777 F.2d at 391-92) (additional citations omitted).

The court ultimately concluded that the false-name statement provided by the

defendant at the scene of the stop fell within the routine booking question

exception.  Id.

The Eighth Circuit in McLaughlin cited a Second Circuit case, United

States v. Burns, 684 F.2d 1066 (2d Cir. 1982), with approval.  McLaughlin, 777

F.2d at 392.  In Burns, the defendant had been given Miranda warnings at the

time he was interrogated by Drug Enforcement Agency (DEA) agents.  Burns,

684 F.2d at 1075.  After answering a few questions, Burns invoked his right to

counsel.  Id.  Thereafter, an Assistant United States Attorney gave Burns new

Miranda warnings and then interrogated him again, ostensibly for purposes of

a bail hearing.  Id.  The Second Circuit rejected the government's

characterization of the second interview as seeking merely "pedigree information" that fell outside the scope of <u>Miranda</u>.  <u>Id.</u> at 1075-1076.[2]

In another pre-<u>Muniz</u> case that presaged the investigatory/routine booking dichotomy set forth by the Court in <u>Muniz</u>, the court in <u>United States v. Poole</u>, 794 F.2d 462 (9th Cir. 1986), suppressed a defendant's statement giving a false name.  Poole was given <u>Miranda</u> warnings and invoked his right to remain silent, but police continued to interrogate him, eliciting a statement from Poole in which he gave a false name.  <u>Id.</u> at 464.  Noting that "[a]n incriminating statement is 'any response-whether inculpatory or exculpatory–that the prosecution may seek to introduce at trial,' " the court found that the questions posed by the police to Poole were not part of the routine booking process, but were part of an interview which was conducted for investigatory purposes.  <u>Id.</u> at 466 (quoting <u>Innis</u>, 446 U.S. at 301 n.5).

Here, Deputy George knew that Mr. Johnson had previously identified himself with the name of "Dave."  After Mr. Johnson made this statement, Deputy George subsequently discovered an identification card in Mr. Johnson's possession identifying him as "Jason" with a photograph that was an "identical match" of Mr. Johnson.  Thus, when Deputy George asked the follow-up question asking Mr. Johnson to again identify himself, Deputy George was acting in an investigatory capacity, not a routine booking capacity.

---

[2]However, because the issue was not preserved below, it did not survive harmless error analysis on appeal.  <u>Burns</u>, 684 F.2d at 1076.

Accordingly, the court recommends that both of Mr. Johnson's post-arrest statements in response to these two questions be suppressed. At the time Deputy George posed these questions to Mr. Johnson, he should have known that they were reasonably likely to elicit an incriminating response. Deputy George's questions constitute custodial interrogation, and Mr. Johnson's answers constitute testimonial evidence which must be suppressed in the absence of <u>Miranda</u> warnings.   <u>Muniz</u>, 496 U.S. at 600 (suppression of testimonial statements in response to custodial interrogation must be suppressed); <u>Brown</u>, 101 F.3d at 1274 (if police should reasonably be aware that the information sought is directly relevant to the substantive offense charged the question is subject to scrutiny); <u>Poole</u>, 794 F.2d at 466-467. Even though Mr. Johnson's real name would have been discovered eventually during the booking process, that fact does not render improperly obtained statements admissible. <u>See</u> <u>United States v. Alvarez-Gonzalez</u>, 319 F.3d 1070, 1071-1072 (8th Cir. 2003) (court affirmed the district court in suppressing defendant's non-<u>Mirandized</u> statements to troopers prior to contact with Border Patrol); <u>see also</u> <u>United States v. Perez-Perez</u>, 337 F.3d 990, 994 (8th Cir. 2003) (court noted that the identity of a defendant obtained by exploitation of a Fourth Amendment violation should be suppressed) (citing <u>United States v. Guevara-Martinez</u>, 262 F.3d 751, 756 (8th Cir. 2001)). The distinction is that the government can introduce evidence of who Jason Johnson is; it may not

introduce these two statements from Jason about who *he alleged he was* and
*why*.

Mr. Johnson's post-arrest statements during his attempted escape ("help
me out, home boy, help me out") and his post-arrest statements when he was
alone in the back of the patrol vehicle during the search of his vehicle should
not be suppressed.  These statements were made spontaneously by
Mr. Johnson without any questioning or any other form of prompting from law
enforcement.  Thus, the second prong of <u>Miranda</u> is not present with regard to
these statements–there was no interrogation.

Finally, the court concludes that Deputy George's question to
Mr. Johnson seeking confirmation of his current address should not be
suppressed.  Unlike the question about his identity, the question about
Mr. Johnson's address appears to be routine and Deputy George could have
had no reason to expect that the answer to the question would likely
incriminate Mr. Johnson.  <u>Muniz</u>, 496 U.S. at 601; <u>Brown</u>, 101 F.3d at 1274-
1275; <u>McLaughlin</u>, 777 F.2d 391-392.  Accordingly, it is this court's
recommendation that Mr. Johnson's post-arrest statement as to his identity
and why he initially lied, should be suppressed, but his statements during the
attempted escape, in the back of the patrol vehicle and his statement
confirming his address should not be suppressed.

Having thus concluded, the court nevertheless notes that this entire
preceding discussion should have been unnecessary had Deputy George simply

20

followed the rule laid out in Miranda.  Miranda has been the law of this land since 1966.  Part of the reason Miranda has endured the test of time is because of its bright-line, simplistic quality:  officers know that when a suspect is arrested, or subject to restriction of movement tantamount to formal arrest, interrogation cannot take place absent first advising the suspect of his Miranda rights and a valid waiver of those rights.

The South Dakota Supreme Court has consistently upheld Miranda.  Eighteen years ago, in a case in which Rapid City law enforcement officers violated Miranda by failing to give the full advisement of rights required, that court admonished that if the Rapid City law enforcement establishment did not "supply its officers and detectives with a standard Miranda warning card, it should, and the officers should use them."  See South Dakota v. Brings Plenty, 459 N.W.2d 390, 395 (S.D. 1990).  The United States Supreme Court has noted that Miranda "has become embedded in routine police practice to the point where the warnings have become part of our national culture."  Dickerson v. United States, 530 U.S. 428, 443 (2000).  At least this is the Supreme Court's–and this court's–expectation.

However, in South Dakota, the case appears to be somewhat different.  Deputy George is not the first state law enforcement officer to come before this court admitting a complete lack of compliance with the requirements of Miranda.  Instead, this is the fourth such case to come before this court in the last six months involving state law enforcement officers.  See United States v.

Hernandez-Mendoza, CR 08-50027, Docket No. 59, Report and
Recommendations (D.S.D. June 30, 2008) (state highway patrol trooper placed
defendant in handcuffs and then proceeded to interrogate defendant about why
the back of his vehicle was all tore up); United States v. Buchanan, CR 07-
50118, Docket No. 29, Report and Recommendations (D.S.D. May 8, 2008)
(state DCI law enforcement agents proceeded to interrogate defendant in
handcuffs detained in the jail despite defendant's invocation of his right to
counsel); United States v. Sutherland, CR. 07-50106-02, Report and
Recommendations, Docket No. 33 (D.S.D. Feb. 7, 2008) (state highway patrol
trooper placed defendant in handcuffs and then proceeded to interrogate
defendant about what he would find in a search of her car).

Given how simple the rule in Miranda is for law enforcement to follow,
one occurrence of a Miranda violation in a year's time would be noteworthy.
Four such violations in the span of six months, in cases solely before this
court, raises concerns that the disregard of Miranda is systemic and the
product of design at the state law enforcement level.  The court notes that
Deputy George had no problem complying with the requirement that he advise
Mr. Johnson of the mandatory blood-draw law under South Dakota law.  He
could just as easily have complied with Miranda.

In cases worked by federal law enforcement agents, this court discerns
no pattern of evading or ignoring Miranda.  Instead, the pattern is strict
compliance with that law.  See e.g. United States v. Last Horse, CR 07-50113,

22

Docket No. 45, Report and Recommendation (D.S.D. Mar. 4, 2008) (federal FBI officer advised defendant of Miranda rights before interrogation even though defendant was not under arrest and not in custody); United States v. Means, CR 07-50003-01, Docket No. 101, Report and Recommendation (D.S.D. Jan. 22, 2008) (federal FBI officer went to great lengths to advise defendant of Miranda rights and to make sure she understood them before waiving them); United States v. Pumpkin Seed, CR 07-50062, Docket No. 23, Report and Recommendation (D.S.D. Sept. 17, 2007) (federal BIA officers read defendant Miranda rights at the time of his initial arrest and again upon questioning at the jail three days later); United States v. White, CR 07-50016, Docket No. 59, Report and Recommendation (D.S.D. July 29, 2007) (federal park ranger refrained from asking questions after placing defendants in handcuffs until full Miranda advisement was given, and defendants waived rights).  In any event, the court takes note of this pattern and suggests that there is, at a minimum, cause for concern.

**B.    Search of the Vehicle and Seizure of the Firearms**

Mr. Johnson challenges both the legality of the initial stop by Deputy George and the subsequent search of his vehicle.  Both are governed by Fourth Amendment precepts.

**1.    The Initial Stop**

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a search and seizure under the Fourth

Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  Brendlin v. California, 551 U.S. ___, 127 S. Ct. 2400, 2406 (2007); Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).  A stop of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle.  Brendlin, 551 U.S. ___, 127 S. Ct. at 2406-2408.  The "Terry stop" is a variety of traffic stop that is permissible under the Fourth Amendment if it is supported by "reasonable suspicion."

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court stated the basis of what was to become known as a "Terry stop":

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Terry, 392 U.S. at 30.  The original "Terry stop" applied to a pedestrian, but courts have expanded the analysis in Terry to apply to vehicle stops.  See Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).

24

An officer making a <u>Terry</u> stop "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  <u>INS v. Delgado</u>, 466 U.S. 210, 217 (1984).  The Court has held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a <u>Terry</u> stop is obviously less demanding than for probable cause." <u>Sokolow</u>, 490 U.S. at 7 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)).  "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made." <u>Spotts</u>, 275 F.3d at 718.

"An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation." <u>United States v. Sallis</u>, 507 F.3d 646, 649 (8th Cir. 2007) (quoting <u>United States v. Coney</u>, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002)).  <u>See also</u> <u>United States v. Ehrmann</u>, 421 F.3d 774, 780 (8th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1122 (2006).  " 'This is true even if a valid traffic stop is a pretext for other investigation.' " <u>Sallis</u>, 507 F.3d at 649 (quoting <u>Coney</u>, 456 F.3d at 855-856 (quoting <u>Linkous</u>, 285 F.3d at 719).  <u>See also</u> <u>Ehrmann</u>, 421 F.3d at 780.  "[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the

25

validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007). See also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

If the officer has an objectively reasonable belief that the suspect has violated traffic law, even if the officer is mistaken, reasonable suspicion for the stop can still exist. United States v. Bueno, 443 F.3d 1017, 1024-1025 (8th Cir. 2006) (citing United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005)); United States v. Martin, 411 F.3d 998, 1000-1002 (8th Cir. 2005).

Here, Deputy George testified that he observed the defendant's vehicle approach an intersection controlled by a flashing red light which required that defendant come to a full stop before proceeding through the intersection. Deputy George also testified that he observed the defendant roll through this intersection without coming to a complete stop. Thereafter, Deputy George effected the stop of Mr. Johnson's vehicle.

Mr. Johnson attempts to undermine the deputy's testimony in this regard by introducing testimony that Jolly Lane, the road on which both the deputy and Mr. Johnson were traveling south, crests and then descends immediately before the intersection in question. Thus, apparently, Mr. Johnson's suggestion is that the deputy could not have seen Mr. Johnson's

26

vehicle as it traveled through the intersection because Mr. Johnson's vehicle would have been out of sight in the descending part of Jolly Lane.

Of course, Mr. Johnson's suggestion only gains credence if supporting evidence was also introduced that Deputy George's patrol vehicle was sufficiently far behind Mr. Johnson's vehicle in order for the crest and descent in Jolly Lane to have blocked Deputy George's view.  No such evidence was introduced.  Instead, the only evidence that was introduced was that Deputy George saw Mr. Johnson's vehicle as it came to and passed through the intersection.  The court specifically finds Deputy George's testimony on this point to be credible.  Furthermore, the photos introduced by Mr. Johnson, Exhibits 101 through 104, show that there was sufficient distance involved in the descending part of Jolly Lane that Deputy George could have been traveling closely enough behind Mr. Johnson's vehicle to have observed what he says he saw.  Since no countervailing evidence was introduced that would undermine the deputy's testimony, the court concludes that the initial stop was legal, based as it was upon the officer's first-hand observance of a traffic violation. Sallis, 507 F.3d at 649.

### 2.    The Search

Mr. Johnson also challenges the search of his vehicle following his arrest on state charges of driving under the influence and false personation.  This argument again implicates the protections of the Fourth Amendment.

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. CONST. amend. IV. "Generally, to search a private place, person, or effect, law enforcement must obtain a warrant supported by probable cause from a judicial officer." United States v. Sanders, 341 F.3d 809, 818 (8th Cir. 2003) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). The same proposition holds true for the seizure of property–"[g]enerally, police officers must have a warrant requirement before they can seize a person's property." United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1358 (8th Cir. 1993) (citing United States v. Place, 462 U.S. 696, 701 (1983)). A search or seizure conducted by the government without a warrant is presumptively unreasonable. United States v. Kimhong Thi Le, 474 F. 3d 511, 514 (8th Cir. 2007); United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004). "The touchstone of the Fourth Amendment's promise is 'reasonableness,' which generally–though not always–translates into a warrant requirement." United States v. Hatten, 68 F.3d 257, 260 (8th Cir. 1995) (citing Veronica School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)).

Because the "overriding principle of the Fourth Amendment is one of reasonableness," the courts have created "logical and flexible" exceptions to the warrant requirement. United States v. Martin, 806 F.2d 204, 206 (8th Cir. 1986). "A warrantless search of a private place can survive constitutional

28

inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant." United States v. Heisman, 503 F.2d 1284, 1287 (8th Cir. 1974) (citing Jones v. United States, 357 U.S. 493, 499 (1958)). "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." United States v. Reidesel, 987 F.2d 1383, 1388 (8th Cir. 1993). One such exception to the warrant requirement is the search incident to arrest.

A police officer may search a vehicle and the driver of the vehicle incident to a lawful arrest. New York v. Belton, 453 U.S. 454, 460 (1981). "[A] lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and . . . such search is 'not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment' " United States v. Ball, 499 F.3d 890, 896 (8th Cir. 2007) (quoting United States v. Hrasky, 453 F.3d 1099, 1101 (8th Cir. 2006) (quoting United States v. Robinson, 414 U.S. 218, 235 (1973)). "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Ball, 499 F.3d at 896. If the search of the passenger compartment of an automobile incident to arrest turns up contraband or other indicia that provides probable cause to believe that the

29

automobile contains contraband or evidence of a crime, then law enforcement can search the whole vehicle pursuant to the automobile exception to the warrant requirement.  Id. at 897 (citing United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)).

Here, no search of Mr. Johnson's vehicle took place until after he was arrested.  The weapons which were discovered as part of that search were found in the passenger compartment of Mr. Johnson's vehicle, in plain view on the back passenger seat.  Thus, the search was justified by the above-discussed authority providing that search of an automobile passenger compartment incident to the driver's arrest is an exception to the warrant requirement.  Accordingly, the court does not recommend suppression of the fruits of the search of Mr. Johnson's vehicle.

## CONCLUSION

Based on the evidence adduced at the hearing, the above findings of fact, and the law, the court recommends that Jason Johnson's motion to suppress [Docket 28] be granted in part and denied in part.  The court recommends that Mr. Johnson's pre-arrest statements and the evidence seized from his vehicle should not be suppressed.  The court further recommends that two of Mr. Johnson's post-arrest statements (in response to the questions "why did you lie" and "Are you Jason?"), taken without the benefit of Miranda warnings

should be suppressed.  The court does not recommend suppression of the other post-arrest statements made by Mr. Johnson as discussed above.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by thedistrict court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated July 10, 2008.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE